UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT MILLER,

    Plaintiff,

v.

FORD MOTOR COMPANY,

    Defendant.
_____/

Case No. 24-cv-
Hon.

ERIC STEMPIEN (P58703)
MALLORIE M. BLAYLOCK (P84331)
STEMPIEN LAW, PLLC
Attorneys for Plaintiff
38701 Seven Mile Road, Suite 445
Livonia, MI 48152
P/F: 734-744-7002
eric@stempien.com
mallorie@stempien.com
_____/

## COMPLAINT AND JURY DEMAND

Plaintiff, Robert Miller, by and through his attorneys, Stempien Law, PLLC, hereby complains against Defendant, Ford Motor Company, and in support thereof states:

### JURISDICTION AND VENUE

1. Plaintiff Robert Miller ("Miller" or "Plaintiff") is a resident of the City of Newport, County of Monroe, State of Michigan.

1

2. Defendant Ford Motor Company ("Ford" or "Defendant") is a foreign corporation that conducts continuous and systematic business in the State of Michigan.

3. Jurisdiction is vested with this Court pursuant to 29 USC §2601, et. seq. and 28 USC §1331.

## GENERAL ALLEGATIONS

4. On or about September 26, 2013, Miller began his employment with Ford.

5. Plaintiff was hired as a clay-sculptor then was transferred to rapid prototyping fabricator working in the 3D printing department until his discharge on or about April 26, 2024.

6. When the COVID-19 Pandemic first began, Ford required all employees to get the COVID-19 vaccine, or they would be terminated.

7. Miller, therefore, got the COVID-19 vaccine.

8. About a month after being vaccinated, Miller began experiencing multiple health complications.

9. On or about December 17, 2021, Miller tested positive for COVID-19.

10. In or about early January 2022, Miller suffered from pneumonia due to having, or brought on by, COVID-19, which continued to worsen, preventing him from returning to work.

11. In or about mid-March 2022, Miller's pneumonia turned into long pneumonia with Chronic Obstructive Pulmonary Disease ("COPD"); Miller's lungs were operating at sixty percent (60%) because they were not filtering his carbon dioxide levels properly, causing him to have fainting spells.

12. During this time, Miller was unable to drive or participate in any strenuous activity due to the fainting and dizziness he experienced, which further prevented him from returning to work.

13. Miller did not return to work until in or about early April 2022.

14. From December 17, 2021 until Miller's return to work in early April 2022, he was on short term disability leave for approximately twelve weeks with some extended time due to his serious health condition.

15. Upon Miller's return to work, he offered to provide doctor's notes and other medical documentation from his time off.

16. Miller's boss/supervisor, William "Lee" Pomerville ("Pomerville") declined Miller's offer to provide medical documentation, telling Miller it was not necessary.

17. In or about April 2022, when Miller returned to work, he continued to experience days where he would not feel well.

18. On those days in which Miller did not feel well, he did not drive in to work because he lived over one hour away and did not feel comfortable or safe driving.

19. Miller would always provide doctor's notes when requesting days off and never went over his allotted time.

20. Pomerville again told Miller that he [Miller] did not need to provide Ford with doctor's notes, but Miller continued to provide the doctor's notes to Ford.

21. In or about December 2022, Miller underwent a sphincterotomy for anal fissures and missed a week of work. Miller used his vacation time for this week off.

22. In or about January 2023, when Miller returned to work, he had a performance review.

23. The performance review went relatively well, although Pomerville stated that Miller had missed a lot of work; Miller reiterated that he missed work due to being sick and had not gone over his allotted time off.

24. At the time of the January 2023 performance review, Miller still had a week of available vacation time.

25. In or about April 2023, Miller's stitches broke from his sphincterotomy and he developed sepsis, which caused him to miss a week of work.

4

26. On or about January 19, 2024, Miller tested positive for COVID-19 again, Ford directed Miller to not come in to work so long as he was experiencing COVID-19 symptoms, and Miller missed about a week and a half of work as a result.

27. Miller asked his team lead, Patrick Gabriel ("Team Lead Gabriel"), if Miller could use his remaining available vacation days, instead of his sick days, for this time off.

28. Team Lead Gabriel agreed to allow Miller to use his remaining available vacation days, instead of his sick days.

29. Team Lead Gabriel then told Miller that it would be too complicated to switch the time off and reassured Miller that it would not matter anyways, and that their time is all the same in the end.

30. When Miller returned to work, Pomerville had Miller wear a mask for two weeks, which made breathing difficult for Miller due to his long COVID issues and COPD.

31. There was no federal, state, or CDC mask mandate in place in January or February 2024.

32. Pomerville was aware of the breathing issues Miller was experiencing with and without wearing a mask.

5

33. Furthermore, when Miller returned to work, he approached Ford's management and offered to provide medical documentation from his time off.

34. Ford's management stated that they did not need the documentation.

35. On or about March 26, 2024, Miller went to see his doctor because his long COVID and lung issues were not improving with use of inhalers and breathing treatments.

36. Miller's doctor performed an EKG, which revealed that Miller has Arterial Fibrillation ("AFib") and was on the road to having a stroke at any time.

37. In addition to his lung issues, Miller and his doctors discovered the AFib had been going on for at least three years and, as a result, Miller was placed on additional medications and referred to see a cardiologist.

38. After this appointment, Miller notified Ford's management about his heart issues and conditions. Miller did so verbally, considering Ford never required Miller to provide medical documentation or doctor's notes previously.

39. On or about April 4, 2024, Miller woke up in the morning to go to work; he was sweating, dizzy, and experiencing vertigo; his wife rushed him to the emergency room; and the doctors said that Miller was on the verge of having a stroke.

40. On or about April 5, 2024, Miller's heart was not functioning properly, which caused blood to pool at the bottom of his heart, and his doctors performed an emergency cardioversion on him.

41. During this procedure, the doctors had to put Miller under, stop his heart three separate times, and bring him back to life, but, ultimately, the cardioversion did not work because Miller's heart was in AFib the entire time.

42. On or about April 8, 2024 Miller underwent a second cardioversion, which also did not work because of the AFib, and his doctor then scheduled him for an AFib ablation for May 9, 2024.

43. Miller informed Ford's management, including Pomerville, about his week at the hospital; that his doctor told him to take it easy and not do anything too strenuous; and that his doctor recommended he take a month off work, but Miller said it was not possible because he did not have enough paid leave left to use.

44. Upon Miller's return, he underwent a performance review where he brought his medical documentation to Pomerville and asked whether he should apply for Family Medical Leave Act ("FMLA") leave, or apply for short term disability because he only had two and a half weeks of vacation left and Miller was worried about going over his allotted time off because of his recently discovered heart condition.

45. Pomerville reassured Miller he did not need to apply for FMLA leave or short-term disability because he had available vacation time left.

46. Pomerville told Miller to not worry about it until he has no available time off left. Miller did not inquire further.

47. Also during the performance review, Miller inquired about a pay raise.

48. At the time of the performance review, Miller had been a Ford employee for eight (8) years and was at a level six pay grade.

49. At the time of the performance review, there were other employees who were hired after Miller and were at a pay grade of seven or eight.

50. When Miller asked Pomerville about a raise, Pomerville responded, stating it was difficult to justify a raise for Miller when he had to take four months off work.

51. Miller had to take four months off work due to his illness and serious health condition.

52. Miller taking time off work for an illness and serious health condition should not be a factor in assessing his pay grade or his ability to obtain a pay raise.

53. Any Ford employee taking time off work for an illness and serious health condition should not be a factor in assessing his, her, or their pay grade or ability to obtain a pay raise.

54. After being diagnosed with AFib, Miller's doctor wrote a note for him to get a handicap sticker, noting that he should not walk more than 200 feet to the entrance of his job until he has his AFib ablation done, otherwise he could trigger a stroke.

55. Miller provided the note for the handicap sticker to Pomerville.

56. Pomerville directed Miller to park closer, in an alley by the door.

57. Miller called the building supervisor, Darryl, to notify him of the parking situation.

58. Despite Miller's handicap sticker and permission from Pomerville, Darryl informed Miller that he cannot park in the alley outside the door and that it is for emergency vehicles only; meanwhile, there are company vehicles, union vehicles, and personal vehicles present in this alley.

59. On or about April 26, 2024, Miller was tapped on the shoulder by Pomerville, was told that he no longer works at Ford, and that he needed to leave.

60. When Miller asked why, Pomerville responded by stating that Miller was sick too much, was unreliable, and missed too much work; despite Miller inquiring about FMLA and STD, providing doctor's notes, and never going over his allotted available time off.

61. At the time of Miller's April 26, 2024 termination, he still had two weeks of available unused vacation time.

## COUNT I – VIOLATION OF FMLA
## (INTERFERENCE)

62. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

63. Miller was an eligible employee as that term is defined by the FMLA.

64. Ford is a covered employer as that term is defined by the FMLA.

65. Miller's requested medical leave was protected by the FMLA.

66. Miller's position should have been protected by the FMLA until his return.

67. Defendant interfered with Miller's rights under the FMLA by discharging him after the time spent in the hospital and on leave for his serious health condition.

    Defendant interfered with Miller's rights under the FMLA by discharging him despite his efforts to inquire about FMLA leave for his serious health condition.

68. As a direct and proximate result of Defendant's interference with Miller's FMLA rights, Miller suffered damages, including but not limited to: wage loss, lost employment benefits and lost pension benefits, plus interest, costs and attorney fees allowed by the statute.

69. Further, because Defendant's violation of FMLA was not in good faith and Defendant did not have reasonable grounds for believing the termination was

not violation of FMLA, Plaintiff is entitled to an award of liquidated damages pursuant to 29 USC §2617(a)(1).

### COUNT II – VIOLATION OF FMLA (RETALIATION/DISCRIMINATION)

70. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as fully set forth herein and further states that:

71. Ford retaliated and/or discriminated against Miller for exercising his FMLA rights, as fully explained herein above, including but not limited to, by discharging Plaintiff for missing work due to his serious health condition.

72. Ford retaliated and/or discriminated against Miller, as fully explained herein above, including but not limited to, by for asking his boss if he should apply for FMLA leave, whom said no, then discharged Plaintiff anyways for missing too much work while sick.

73. As a direct and proximate result of Defendant's violation of the FMLA, Plaintiff suffered damages as fully set forth in herein above.

WHEREFORE Plaintiff respectfully requests that this Honorable Court enter judgment in favor of Plaintiff and against Defendant in whatever amount is deemed reasonable equitable, and fair, including but not limited to compensating Plaintiff for his wage loss, lost employment benefits, lost pension benefits, plus interest, costs and attorney fees allowed by the statute, as well as liquidated damages pursuant to 29 USC §2617(a)(1), pain suffering, and emotional distress.

11

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of the within cause.

                              Respectfully submitted,

                              STEMPIEN LAW, PLLC

                              */s/ Mallorie M. Blaylock*
                              MALLORIE M. BLAYLOCK (P84331)
                              Attorneys for Plaintiff
                              38701 Seven Mile Road, Suite 445
                              Livonia, MI 48152
                              P/F: 734-744-7002
                              mallorie@stempien.com